ORIGINAL

U.S. DISTRICT COURT
MIDDLE GEORGIA

2011 FEB -7 PM 3: 39

DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA

UNITED STATES OF AMERICA )
*ex rel.* CHAD WILLIS, )
)          Case No: __5 : 11-CV-041__
    Plaintiff, )
)          **FILED UNDER SEAL**
v. )
)
ANGELS OF HOPE HOSPICE, INC., )    **DO NOT PLACE IN PRESS BOX**
)          **DO NOT ENTER ON PACER**
    Defendant. )
)          **DEMAND FOR JURY**

## *QUI TAM* COMPLAINT

Plaintiff-Relator Chad Willis, on behalf of himself and the United States of America, alleges and claims against Angels of Hope Hospice, Inc., as follows:

### JURISDICTION AND VENUE

1.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2.    Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendant qualifies to do business in the State of Georgia, transacts substantial business in the State of Georgia, transacts substantial business in this judicial district, and can be found here. Additionally, and as described herein, Defendant committed within this judicial district acts proscribed by 31 U.S.C. § 3729. Specifically, and *inter alia*, Defendant submitted and caused to be submitted within this judicial district false

claims for hospice care for ineligible patients and false claims for palliative care which should have been paid for by Defendant, and made or used false records material to such claims.

## PARTIES

3.      Defendant Angels of Hope Hospice, Inc. ("Angels of Hope") is a Medicare-certified hospice provider offering hospice services in several Georgia counties from its locations in Thomaston and LaGrange, Georgia. Angels of Hope is operated by Stephen Frederick ("Frederick"), former Regional Director of Community Relations for SouthernCare, Inc. ("SouthernCare"), a for profit hospice company based in Birmingham, Alabama.  In January, 2009, SouthernCare paid $24.7 million to the United States to settle allegations of Medicare hospice fraud.   Frederick; his wife Robbie Anne Jones Frederick, who is listed as owner of Angels of Hope; Steven De Franco, Angels of Hope Business Manager; and Sue Honeycutt, Admissions Coordinator, were all prominent employees at SouthernCare at the time its hospice fraud was devised and perpetrated.  As described herein, they continue to employ the same fraudulent schemes – along with others – in their new hospice operation at Angels of Hope.

4.      Plaintiff-Relator Chad Willis has a total of six years of experience as a hospice marketer.  Mr. Willis has been employed by Angels of Hope Hospice as a Community Relations Specialist since August, 2010.  Prior to that, he worked for

SouthernCare as a Community Relations Director for approximately five years.  In his time at Angels of Hope, Mr. Willis has witnessed countless instances of knowing, willful fraud committed with the intent of falsely inflating Medicare billing and illegally shifting costs onto the Medicare program.  Specifically, Mr. Willis has become personally familiar with Defendant's practices of paying illicit kickbacks in exchange for patient referrals; of admitting and billing for non-terminal, ineligible hospice patients; and of fraudulently eliciting and backdating hospice revocations from patients who require expensive palliative procedures that should be paid by Defendant.  Through his experience as a marketing employee at Angels of Hope Hospice, Plaintiff-Relator has learned that Defendant conducts its hospice operations with the same fraudulent intent and by many of the same means as SouthernCare.

5.      Through his experience, Plaintiff-Relator has witnessed so many instances of fraud as to believe that Defendant's fraudulent tactics are widespread, systematic practices endemic to Defendant.  Defendant's fraudulent conduct offends Plaintiff-Relator's long-standing dedication to the mission of hospice care and to the needs of terminally-ill patients and causes him to file this Complaint on behalf of himself and the United States as a relator under the *qui tam* provisions of the False Claims Act.

6.      Prior to filing this Complaint, Plaintiff-Relator voluntarily disclosed to the Government the information upon which this action is based.  To the extent that any public disclosure has taken place as defined by 31 U.S.C. § 3739(e)(4)(A), Plaintiff-

Relator is the original source of the information for purposes of that Section. Alternatively, Plaintiff-Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Plaintiff-Relator voluntarily provided that information to the Government before filing this Complaint. Plaintiff-Relator is serving contemporaneously herewith a statement of the material evidence in his possession upon which his claims are based.

## THE MEDICARE HOSPICE BENEFIT

### I.    Background

7.    Through the Medicare Program ("Medicare"), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, the United States provides health insurance coverage for eligible citizens. Medicare is overseen by the United States Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS").

8.    Through the Medicare Hospice Benefit (Hospice), Medicare pays for hospice care for certain terminally-ill patients who elect to receive such care. *See* 42 U.S.C. § 1395d.  A patient is deemed to be terminally ill if the patient "has a medical prognosis such that his or his life expectancy is 6 months or less if the disease runs its normal course. 42 C.F.R. § 418.3.  In electing hospice care, a patient must agree to forego Medicare coverage for curative treatment. *See* 42 U.S.C. § 1395d.  A patient

4

may at anytime revoke his or his hospice election and resume Medicare Part A coverage. 42 C.F.R. § 418.28.

9.     Defendant's aggressive, profit-maximizing business model represents an intrusion of greed into an institution founded upon philosophical, spiritual, and medical notions of charity and care-giving. The impetus for the modern hospice movement in the United States is attributed to psychiatrist Dr. Elizabeth Kübler Ross, whose 1969 *On Death and Dying* is acknowledged to have altered modern perceptions about care for the terminally ill. In the 1970s, U.S. hospices opened their doors as volunteer organizations dedicated to bringing comfort and humanity to terminal patients. Testifying in 1975 before the U.S. Senate Special Sub-committee on Aging, Kübler Ross stated: "We should not institutionalize people. We can give families more help with home care and visiting nurses, giving the families and the patients the spiritual, emotional, and financial help in order to facilitate the final care at home." In 1982, Congress created a provisional Medicare Hospice Benefit, made permanent in 1986 ("Hospice"). By 1990, 800 hospice companies were caring for 76,491 patients, with an average length of stay of 48.4 days.

10.     From such humble, altruistic roots, Hospice has become big business. Medicare Hospice payments rose from $205 million in 1989 to $9.2 billion in 2006. In the 1998 article "Hospice Boom Is Giving Rise to New Fraud," the *New York Times* recognized that the hospice infrastructure "was never designed to handle the expanding

network of nursing homes, hospices, assisted-care centers and other services popping up to serve the nation's growing aging population." Venture capitalists and other investors have been quick to perceive that Hospice represents a potentially unlimited stream of income for those who bring aggressive marketing, sales, and growth tactics into the new industry of care for the dying.

11. Leslie Norwalk, then Acting Director of the Centers for Medicare & Medicaid Services, testified before the U.S. House of Representatives Committee on Ways and Means in 2007 that "Hospice is not intended to be used as a nursing home. Nevertheless, Defendant and other for-profit Hospice companies have instituted a fraudulent scheme to treat the Medicare Hospice Benefit as an improper subsidy for general nursing home and in-home care and to capitalize on and aggressively market to the nation's rapidly growing elderly population.

## II.     Hospice Benefits, Reimbursements, and Requirements

12. Hospice covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician. *See* 42 C.F.R. § 418.22. Hospice is designed to provide pain-relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis. Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, physical and occupational therapy, counseling, home health aide and homemaker

services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness. *See* 42 C.F.R. § 418.202.

13.    Through Medicare and/or Medicaid (indirectly through the States), the United States reimburses hospice providers for services to qualified beneficiaries on a *per diem* rate for each day a qualified beneficiary is enrolled.  42 C.F.R. § 418.302. Medicare or Medicaid makes a daily payment, regardless of the amount of services provided on a given day and even on days when no services are provided.  Payments are made according to a fee schedule with four base payment amounts for the four different categories of care: routine home care (RHC), continuous home care (CHC), in-patient respite care (IRC), and general in-patient care (GIC).

14.    In return for the Hospice *per diem* payment, hospices are obligated to provide patients with all covered palliative services.  *See* 42 C.F.R. § 418.202.  The hospice must design a plan of care inclusive of all covered services necessary to meet the patient's needs.  *See* 42 C.F.R. § 418.56.  Among other services, every hospice must provide short-term inpatient care for pain-control and symptom-management related to the patient's terminal illness. *Id.*; *see also* 42 C.F.R. § 418.108.

15.    Medicare imposes on hospice providers an annual per-patient average cap for reimbursements (the Aggregate Cap). The Aggregate Cap is set by CMS according to federal regulations, and in 2008 stood at $22,386.13 per patient. The Aggregate Cap is not related to expenditures on individual patients.  Rather, it limits the aggregate

reimbursement a provider may receive from Medicare. A hospice provider's compliance is calculated by dividing its total submitted reimbursements over a year by the number of non-duplicative patients enrolled during that year. Thus, every first-time Medicare hospice patient enrolled increases a hospice's Aggregate Cap amount by $22,386.13.

16. Medicare will not pay for hospice services provided to patients who are not terminally ill. *See* 42 U.S.C. § 1395y. Furthermore, it is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary. *See* 42 U.S.C. §1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50. Medicare providers may not bill the United States for medically unnecessary services or procedures performed solely for the profit of the provider. *Id.*

17. Federal law authorizes Medicare administrative contractors ("MACs") and fiscal intermediaries ("FIs") to issue determinations as to the extent of Medicare coverage for particular items or services. *See* 42 U.S.C. 1395ff. Accordingly, Medicare Hospice MACs and FIs publish local coverage determinations ("LCDs") establishing requirements for and limitations on Hospice coverage. *See, e.g.,* LCDs Published by Palmetto GBA, Georgia Home Health/Hospice FI, *available at* http://www.cms.gov/mcd/results_index.asp?from='lmrpstate'&contractor=88&name=P almetto+GBA+%2800380%2C+RHHI%29&letter_range=4. Medicare will not pay for hospice care provided to a patient who does not meet LCDs. *See* 42 U.S.C. 1395y.

18.    To enroll as Medicare providers, Defendant was required to submit a

Medicare Enrollment Application for Institutional Providers.  *See* CMS Form 855A.

In submitting Form 855A, Defendant made the following Certification Statement to

CMS:

> I agree to abide by the Medicare laws, regulations and
> program instructions that apply to this provider. The
> Medicare laws, regulations, and program instructions are
> available through the Medicare contractor. I understand that
> payment of a claim by Medicare is conditioned upon the
> claim and the underlying transaction complying with such
> laws, regulations, and program instructions (including, but
> not limited to, the Federal Anti-Kickback statute and the
> Stark law), and on the provider's compliance with all
> applicable conditions of participation in Medicare.

Form CMS-855A.

19.    Defendant then billed Medicare by submitting a claim form (CMS Form

1450) to the FI responsible for administering Medicare hospice claims on behalf of the

United States.  *See* CMS Form 1450.  Each time it submitted a claim to the United

States through the FI, Defendant certified that the claim was true, correct, and

complete, and complied with all Medicare laws and regulations.

20.    Defendant thus certified that each claim for a hospice *per diem* payment

represented a day of care provided to a terminally ill patient, and CMS expressly

conditioned its payment on the truth and accuracy of that certification.  Defendant

further certified that its programs were in compliance with Medicare regulations,

including the requirement that Defendant provide short-term in patient care related to its patients' terminal conditions.

### III.    THE ANTI-KICKBACK STATUTE

21.    The Medicare and Medicaid Patient Protection Act of 1987, as amended and codified at 42 U.S.C. §1320a-7b (the "Anti-kickback Statute" or "AKS"), provides as follows:

> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person:
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

The provisions of the Patient Protection and Affordable Care Act, Publ. L No. I 11-148, 124 Stat.119 § 6402(f)(1) (2010) ("PPACA"), adopted on March 23, 2010, provide that: "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for the purposes of [the False Claims Act]."

22.    At all times relevant to this complaint, compliance with the AKS was a condition of participation for a health care provider in the Medicare program. Moreover, compliance with the AKS is a condition of payment for claims made to Medicare for reimbursement for services, including Hospice services.

## DEFENDANT'S FRAUDULENT SCHEMES

### I.    Billing for Ineligible Hospice Patients

23.    Defendant systematically defrauds Medicare and Medicaid by recruiting and cycling non-qualifying patients through its Hospice program.

24.    Defendant actively recruits, certifies, and bills the United States through CMS for ineligible patients.   Defendant perpetrates its scheme by paying illicit kickbacks in exchange for referrals as described below, by relentlessly pressuring staff to admit ineligible patients, and by deliberately under-training staff to keep them in ignorance of Hospice eligibility requirements.

25.    Although many of the fraudulent methods employed by Frederick and Angels of Hope resemble those devised by SouthernCare, Frederick has evolved the scheme: rather than keeping ineligible patients on the census for long periods, Angels of Hope admits a very high volume of Medicare patients – without regard to eligibility – then quickly discharges them after 60 or 90 days.  This tactic serves two purposes: first, by avoiding "long length of stay patients," Angels of Hope evades scrutiny from CMS – CMS audits and investigations are often triggered by long lengths of stay;

11

second, Angels of Hope avoids Aggregate Cap liability, since the number of Medicare patients it admits is large in comparison to the cost of their care during their relatively brief stay.

26.     To this end, Frederick and Angels of Hope aggressively target "first-time Medicare" patients – patients who have never elected Hospice and who therefore represent a full $22,386.13 in Aggregate Cap "cushion." Angels of Hope marketers receive bonuses based solely upon the volume of first-time Medicare patients – no others. Other patients, such as indigent Medicaid patients, patients previously admitted to Hospice, or those with private insurance, must be personally approved by Frederick prior to admission and do not count toward marketing bonuses.

27.     Frederick sees to it that nearly every first-time Medicare patient referred to Angles of Hope is admitted, regardless of eligibility. In or around September, 2010, Plaintiff-Relator Willis was party to a conversation between Frederick and an Angels of Hope Admissions Coordinator (a clinical staff member charged with evaluating and admitting patients) involving two patients that the coordinator had rejected as ineligible for Hospice. Frederick berated the Admissions Coordinator and implemented a policy requiring that Frederick approve every patient declination.

28.     Defendant perpetrates its fraud in part by deliberately keeping its employees in ignorance of Medicare regulations and LCDs for Hospice eligibility; in violation of Medicare Conditions of Participation, *see, e.g.,* 42 C.F.R. § 418.58,

Defendant's owners and managers encourage ignorance among staff so as to more easily coerce them into admitting ineligible patients.

29.     In order to conceal Angels of Hope's fraud, Frederick instructs employees to "chart negative" – that is, to falsify assessments and nursing notes to create the fraudulent appearance that the patients are terminal and are in decline.    After admittance, he pledges the staff to closely watch borderline patients for 90 days and reassess at that time.   Thereafter, Frederick encourages discharge of any patients who require care for over six months or who need costly hospital treatments, to avoid incurring costs and evade detection by CMS.

30.     The result of Defendant's practices is that many of its patients do not qualify for Hospice care and are falsely billed to the United States.  There are currently about eighty hospice patients enrolled at Angels of Hope from the Thomaston, Georgia area, a sparsely populated area in west-central Georgia (an implausible figure that contrasts with demographic realities).   About thirty of the eighty enrolled are patients of Dr. David Fieseler ("Fieseler"), a local practicing physician.  As detailed below, Angels of Hope pays Fieseler illicit referral kickbacks through his wife, an Angels of Hope marketer.  The vast majority of these patients are non-qualifying.

31.     The following are merely representative examples of the results of Defendant's fraudulent practices.  These patients' conditions belie a terminal diagnosis

and do not comport with LCDs, yet they have been fraudulently certified by Defendant as terminally-ill and falsely billed to the United States through CMS:

a.  Dr. A. H. signed an order to have the Angels of Hope Hospice assess patient M. M.  The hospice processed the assessment paperwork but the doctor, for legitimate reasons, declined to sign off on the assessment papers to admit the patient to the Hospice.  Instead, without seeing the patient, Dr. Fieseler, the Angels of Hope Hospice medical director, then signed the papers to authorize admittance.  M. M. was admitted by Defendant on or about November 1, 2010, under a diagnosis of general debility.

b.  Patient Z.A. was admitted on or about November 15, 2010 under a heart disease diagnosis.  The Angels of Hope Hospice Admissions Coordinator had advised after assessment that the patient could not be admitted since the candidate did not exhibit "class IV symptoms at rest and was not on a diuretic.  Frederick ordered the admissions coordinator to alter her admission assessment and falsely document reference to the diuretic. Z.A. does not meet criteria as terminal.

c.  Patient M.M. was admitted in late 2010 under diagnoses of heart disease. The admissions coordinator had declined M.M. because she did not meet criteria for hospice care.  Her only symptom of heart disease was

shortness of breath after exertion. Frederick ordered M.M. admitted on a trial basis stating that they would observe the case for 6 months and then discharge her if she failed to decline.

d.   Patient M.H. was admitted on or about November 1, 2010 under a diagnosis of congestive heart failure. Unknown to the hospice, M.H. had an echocardiogram test performed on November 2, 2010. After discovery of the test, Angels of Hope Hospice nurse Elaine Daniel presented M.H. with a backdated revocation form explaining that if she failed to sign, M.H. would be billed for the test. M.H. signed the backdated form but wrote on the form, "Because can't afford the bill or the cost of hospice."

e.   Patient P.S. was referred to Angels of Hope Hospice in 2010 by a doctor under a diagnosis of bone cancer. P.S. met the hospice criteria of declining rapid terminal illness but continued to receive palliative chemo and radiation treatment. However, Frederick intervened and declined P.S. stating that the patient would not make any money, would cost him money and he could not take that kind of patient.

**II.   Ordering Patient Assessments by Unqualified Personnel and Providing Service under Inadequate Plans of Care**

32.    In violation of Medicare regulations, Defendant deliberately employs unqualified staff to perform patient assessments and to admit patients, and systematically fails to adopt adequate patient care plans.

33.    As outlined above, participation in the Hospice program requires that Defendant provide patients with all necessary palliative care related to their hospice diagnosis and to design a plan of care to meet the patient's needs. *See, e.g.,* 42 C.F.R. § 418.54; 418.56. Initial patient assessments and 14-day periodic patient assessments must be performed by RNs. *See* 42 C.F.R. § 418.54.

34.    In violation of these regulations, Angels of Hope does not perform true clinical assessments prior to admission. The only meaningful assessment performed by Angels of Hope is done by marketing employees, based purely on hospice economics. Thereafter, Frederick sees to it that the Admissions Coordinator nurse certifies and admits every referral (so long as the patient is first-time Medicare); as detailed above, Frederick does not allow any patient to be declined without his approval. As a result, Defendant's patients never receive a true hospice assessment.

35.    Furthermore, Defendant has a blanket policy of operating without Medicare-mandated plans of care, in violation of 42 C.F.R. § 418.56. When Plaintiff-Relator began employment with Angels of Hope Hospice, Frederick informed him that Defendant's patient care decisions are not actually tied to patient acuity or care needs; Defendant simply provides nursing visits and two nursing-aide visits per week,

16

regardless of a patient's condition or requirements. Plaintiff-Relator's experience confirms that Defendant consistently submits false claims to Medicare for patient services rendered without a true patient assessment or a legitimate comprehensive care plan.

36.     Although Defendant claims in its literature to offer physical, occupational and speech therapies, Frederick does not allow performance of such therapies – he falsely informs employees that therapeutic treatment is considered "aggressive" treatment by Medicare.  As a result, Defendant's patients are deprived of care.

### III.     Anti-Kickback Violations – Cash Payments In Exchange for Referrals

37.     Defendant violates the AKS and the False Claims Act by offering and paying per-patient, per-referral remuneration to staff in the form of "referral bonuses, limited to first-time-Medicare patients only.

38.     Ms. Rosie Fieseler is employed by Angels of Hope as a marketing employee in its Thomaston location.  Rosie Fieseler's husband, Dr. David Feiseler, is on of the few physicians in that small community.

39.     Feiseler refers a very high volume of patients from his practice to Angels of Hope – about 30 of the patients currently on the rolls in Thomaston were referred by him.  Naturally, Dr. Feiseler refers all of his patients directly to his wife Rosie.  Rosie, in turn, receives direct cash bonuses from Angels of Hope for every first-time-

Medicare patient referral she obtains. As a result, Dr. Feiseler receives a remuneration in exchange for his referrals to Angels of Hope, in the form of a cash payment through his wife – a plain violation of the Anti-Kickback statute.

### IV. Eliciting and Backdating Fraudulent Revocations for Legitimate Hospice Patients who Require Hospitalization for Palliative Care

40. Defendant fraudulently increases its profits and shifts costs to the United States through a pattern and practice of fraudulently "revoking" legitimate Hospice patients who require expensive palliative hospital care and "backdating" paperwork to evade responsibility for costly procedures.

41. Hospice requires that Defendant bear any costs for palliative care that exceed the standard per-diem amount. *See* 42 C.F.R. §§ 418.56; 418.108; 418.202. The *per-diem* rate paid by the United States to Defendant, however, is generally much less than the actual per-diem cost of even a routine hospital stay for palliative treatment. Unwilling to absorb such high costs of hospital care, Defendant usually rejects all cases where palliative costs may be predicted. For those other cases, Defendant fraudulently shifts these costs to the United States through false revocations.

42. In order to boost its profit margin, Defendant creates the false appearance of a Hospice revocation by coercing almost every hospitalized patient into signing a revocation of his Hospice election (usually by telling the patient that if he does not revoke he will be "stuck with the bill"). Defendant makes no effort to determine

whether a patient's hospitalization is related to his Hospice diagnoses or whether the treatment provided by the hospital amounts to pain or symptom management. Instead, patients going to the hospital are simply revoked.

43.     When patients are hospitalized without notice to Defendant and undergo expensive procedures before Defendant can fraudulently "revoke" the patient, Defendant simply "backdates" the revocation form so that the revocation appears to have taken place prior to the hospital stay. The cost of care which should be borne by Defendant is then borne by the United States through Medicare Part A or Medicaid; as a result of the scheme, the United States pays a full Medicare fee-per-service rate for care that it has already paid for at the lower Hospice per-diem rate.

44.     By and through all of the circumstances described, *supra*, Defendant has violated the healthcare laws and regulations of the United States, undermined the noble intention and mission of Hospice, defrauded the United States of America, and jeopardized the already strained Medicare program.

## COUNT ONE
## PRESENTING OR CAUSING TO BE PRESENTED
## FALSE CLAIMS UNDER 31 U.S.C. § 3729

45.     Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

46.     By and through the fraudulent schemes described herein, Defendant knowingly – with actual knowledge or in deliberate ignorance or with reckless

disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

(a)    Defendant submitted false claims for Hospice care provided to patients whom Defendant knew did not meet Medicare or Medicaid requirements for Hospice, in violation of 42 U.S.C. § 1395y;

(b)    Defendant submitted false claims for Hospice care provided to patients who were not properly assessed by an RN and in the absence of a legitimate care plan as required by 42 C.F.R. §§ 418.201; 418.56.

(c)   Through fraudulent revocations, Defendant caused hospitals and other healthcare providers to submit false claims under Medicare Part A or Medicaid for care that should have been paid for by Defendant by reason of its obligations as Medicare hospice providers under 42 C.F.R. §§ 418.201, *inter alia.*

(d)    Defendant submitted false claims for Hospice resulting from violations of the AKS in the form of illicit referral bonuses;

(e)    Defendant submitted false claims for Hospice services premised upon Defendant's fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere;

47.    The United States paid the false claims described herein and summarized in paragraph 46(a)-(e).

48.     Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and re-certification of Hospice patients and fraudulent billing of the United States through Medicare or Medicaid.

49.     Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relator demands judgment in his favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

## COUNT TWO
## MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. § 3729

50.     Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

51.     By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard

of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

(a)     Defendant created and used false certifications of terminal illness; false patient care plans not calculated to cope with patients' actual needs and conditions; and other false records intended to support its fraudulent billing to the United States, all in violation of 42 U.S.C. §1395y and the Medicare regulations cited *supra*.

(b)     Defendant made false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid, including false certifications on CMS Forms 885A and 1450 as described *supra*, when Defendant was aware that its practices as described herein were in violation of Medicare payment prerequisites, including but not limited to the AKS, 42 U.S.C. §1395y, and the applicable LCDs.

(c)     Defendant made or used or caused to be made or used fraudulent revocation forms intended to create the false appearance that patients required and elected to receive aggressive curative treatment when in fact the patients never truly revoked their hospice election, the treatment required was palliative in nature and should have been paid for by Defendant pursuant to *See* 42 C.F.R. §§418.201; 418.56, *inter alia*, or both;

52.     The false records or statements described herein and summarized in paragraph 51(a)-(c) were material to the false claims submitted or caused to be submitted by Defendant to the United States.

53.     In reliance upon Defendant's false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

54.     Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relator demands judgment in his favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

### COUNT THREE
### "REVERSE FALSE CLAIMS" UNDER
### 31 U.S.C. § 3729(a)(1)(G)

55.     Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

56.     By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard

of the truth or falsity of the information – made, used, or caused to be made or used, a false records or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:

(a)      Defendant knew that it had received millions of dollars in Hospice *per diem* payments for patients who did not qualify for Hospice, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

(b)      Defendant knew that the United States had paid millions of dollars for palliative hospital in-patient treatment that should have been paid for by Defendant, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

57.      As a result of Defendant's fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant.

WHEREFORE, Plaintiff-Relator demands judgment in his favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted

by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

## COUNT FOUR
## FRADULENT INDUCEMENT UNDER 31 U.S.C. § 3729

58. Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

59. By and through the actions described herein, Defendant knowingly presented, or caused to be presented, to the United States false or fraudulent claims, to wit: Defendant fraudulently induced the United States to pay per-patient *per-diem* fees for patient care that Defendant never intended to provide.

60. Through submission of CMS Form 855A and otherwise, Defendant agreed to provide care to patients in return for a per-patient *per-diem* payment from the United States through CMS. By regulation, including 42 C.F.R. § 418.201, United States made it clear that such per-patient *per-diem* payments were consideration for Defendant's agreement to provide ongoing, complete palliative patient care; and Defendant-s agreement to provide such ongoing, complete palliative care was in fact a condition of the United States' per-patient *per-diem* payments to Defendant.

61. At the time that Defendant requested and accepted the per-patient *per-diem* payments, it intended to avoid the high costs of palliative-care procedures and medications by using false documents to create the appearance that patients had

temporarily revoked their Hospice election, in order that such expensive procedures should be billed under Medicare Part A.   In fact, Defendant created the false documents at the moment it admitted each patient.

62.     Accordingly, the United States was misled by Defendant's material misrepresentation that it would provide palliative care for such patients, which Defendant ultimately avoided through fraudulent revocation.  In many instances, after the expensive procedures were completed the patients were fraudulently re-certified for Hospice.

63.     By and through the actions described *supra*, Defendant knowingly made, used, or caused to be made or used, false records or statements, including but not limited to fraudulent revocation documents and back-dated revocation records and false claims for payment to the United States related to the per-patient *per-diem* claims for payment. Such false records or statements were used by Defendant to get false or fraudulent claims paid or approved by the United States.

64.     Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the payments made to Defendant and others by the United States through Medicare for all patients whose hospice election was fraudulently revoked.

WHEREFORE, Plaintiff-Relator requests entry of judgment in his favor on behalf of the United States and against Defendant in an amount equal to treble the

damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

## COUNT FIVE
## CONSPIRACY UNDER 31 U.S.C. § 3729(a)(3)

65.     Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

66.     Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment or approval, to-wit: Defendant knowingly certified and/or re-certified Hospice patients whom it knew did not qualify for Medicare or Medicaid reimbursement and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

67.     The United States paid Defendant for such false claims.

68.     Defendant, in concert with its principals, agents, employees, subsidiaries, and other institutions did agree to submit such false claims to the United States.

69.     Defendant and its principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare or Medicaid.

70.     Defendant's fraudulent actions, together with the fraudulent actions of its principals, agents and employees, have resulted in damage to the United States equal to

the amount paid by the United States to Defendant and others as a result of Defendant's fraudulent claims.

WHEREFORE, Plaintiff-Relator demands judgment in his favor on behalf of the United States and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Plaintiff-Relator may be entitled.

**COUNT SIX**
**SUPPRESSION, FRAUD, AND DECEIT**

71.     Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

72.     Defendant misrepresented or suppressed the material facts that (1) a substantial number of its patients enrolled in Hospice do not qualify for Hospice and are not terminally ill and (2) Defendant created and submitted numerous false revocation forms for patients who never made a true revocation of their Hospice election and who in fact required only palliative care.

73.     Defendant was legally obligated to communicate these facts to the United States.

74.     Such misrepresentations were made willfully to deceive or recklessly without knowledge.

75.   The United States acted on Defendant's material misrepresentations described herein to its detriment.

76.   Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid by the United States as a result of Defendant's fraudulent claims.

WHEREFORE, Plaintiff-Relator demands judgment in his favor on behalf of the United States and against Defendant pursuant to 31 U.S.C. § 3732 and GA. CODE ANN. § 51-6-2  in an amount sufficient to compensate the United States for Defendant's fraud, suppression, and deceit, together with punitive damages in an amount calculated to deter Defendant from engaging in such conduct in the future, along with attorneys' fees, costs, interest, and any other, further, or different relief to which Plaintiff-Relator may be entitled.

Date: February _7th_, 2011.

_____
DANIEL BULLARD, IV (GA Bar No. 094194)

**OF COUNSEL:**
BULLARD & WANGERIN, LLP
2960 Riverside Drive, Suite 280
Macon, Georgia 31209-8107
Tel: (478) 757-8500
Fax: (478) 757-1132
dbullard4@bellsouth.net

29

JAMES F. BARGER, JR. (Pro Hac Vice)

Attorneys for Plaintiff-Relator
Chad Willis

**OF COUNSEL:**
FROHSIN & BARGER, LLC
One Highland Place, Suite 310
2151 Highland Avenue
Birmingham, Alabama 35205
Tel:   205.933.4006
Fax:   205.933.4008
henry@frobar.com
jim@frobar.com
elliott@frobar.com

**RELATOR DEMANDS A TRIAL BY STRUCK JURY**

## NOTICE OF COMPLIANCE

On this the ___ day of February, 2011, Plaintiff-Relator hereby certifies that in compliance with Federal Rule 4 of the Civil Rules of Procedure, service of the *Qui Tam* Complaint has been executed as follows:

**By Hand-Delivery to:**

Michael J. Moore, U. S. Attorney
Attn:  AUSA Danial E. Bennett
United States Attorney's Office
Gateway Plaza
300 Mulberry Street, Suite 400
Macon, GA 31201

**By Certified Mail to:**

Attorney General of the United States of America
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Thurbert E. Baker, A.G.
Office of the Attorney General
State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334

OF COUNSEL