IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| UNITED STATES of AMERICA<br>*ex rel.* CHAD WILLIS, | ) | |
| | ) | |
| Plaintiff/Relator, | ) | CASE NO.: 5:11-CV-041(MTT) |
| | ) | |
| v. | ) | |
| | ) | |
| ANGELS OF HOPE HOSPICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

This False Claims Act ("FCA") case was filed February 7, 2011.  Pursuant to 31

U.S.C. § 3730(b)(2), Relator Chad Willis's complaint was placed under seal awaiting a

decision by the Government as to whether it would intervene and act on the complaint.

The Court granted the Government five extensions of time to investigate Willis's

allegations and determine whether to intervene.  The last of these expired April 25,

2013.  On April 26, the Government notified the Court that it would not intervene

because it still had not completed its investigation.  The complaint was subsequently

unsealed and served upon Defendant Angels of Hope Hospice, Inc.  Willis amended his

complaint, and Angels has moved to dismiss the amended complaint.  For the following

reasons, the motion is **DENIED**.

### I.   FACTUAL BACKGROUND

Angels is a Medicare-certified hospice provider offering its services in several

Georgia counties.  (Doc. 29 at ¶ 3).  Angels is operated by Steven Frederick and owned

by Frederick's wife, Robbie Anne Jones Frederick.  (Doc. 29 at ¶ 3).  Steven DeFranco

acts as Angels' business manager, and Sue Honeycutt is the admissions coordinator of

Angels.  (Doc. 29 at ¶ 3).  Willis is an experienced "hospice marketer," who was employed by Angels as a community relations specialist from August 2010 to April 2011.  (Doc. 29 at ¶ 4).

The Fredericks, DeFranco, Honeycutt, and Willis were all formerly employed by SouthernCare, Inc., a for-profit hospice company based in Birmingham, Alabama.  (Doc. 29 at ¶ 3).  In January 2009, SouthernCare paid $24.7 million to the United States to settle allegations of Medicare hospice fraud.  (Doc. 29 at ¶ 3).  Willis alleges that Steven Frederick (hereafter "Frederick;" Mrs. Frederick is not otherwise mentioned in the complaint) bragged about his involvement in SouthernCare's fraud and his operation of Angels in the same manner.  (Doc. 29 at ¶ 4).

The Medicare hospice benefit pays a predetermined fee for each day a terminally ill patient[1] receives hospice care.  42 U.S.C. § 1395d.  This payment is made to the hospice regardless of the amount of services furnished on any given day.  42 C.F.R. § 418.302(e)(1).  However, Medicare imposes an annual per patient average cap on reimbursements.[2]  (Doc. 29 at ¶ 15).  In 2012, the cap was $25,377.01 per patient. (Doc. 29 at ¶ 15).  This is not a cap on a particular patient, but rather is used to calculate an aggregate cap on reimbursements a provider can receive from Medicare. In effect, this means that when a provider enrolls a first-time Medicare hospice patient,

---

[1] A patient is terminally ill if the patient "has a medical prognosis such that his or her life expectancy is [six] months or less if the disease runs its normal course."  42 C.F.R. § 418.3.

[2] The Medicare statute also establishes an aggregate cap on total reimbursement payments to a hospice provider for all of its Medicare patients in a fiscal year.  The aggregate cap is calculated by multiplying the number of beneficiaries who have elected hospice care during that year with the per-beneficiary cap amount.  42 C.F.R. § 418.309.  The Centers for Medicare and Medicaid Services set the per-beneficiary cap annually.  *Id.*  The per-beneficiary cap amount is referred to throughout this Order as the cap "cushion."

the hospice's aggregate cap is increased by $25,377.01.  (Doc. 29 at ¶ 15).

Willis claims Angels developed a business model based entirely on the continuous admission of new hospice Medicare beneficiaries, whom Frederick and others referred to as "undupes."  (Doc. 29 at ¶ 24).  Willis alleges he learned, through conversations with Frederick,[3] the key to the success of Angels was to admit Medicare patients who had never previously elected hospice care, the "undupes," because those patients represented a full aggregate cap "cushion" to Angels.  (Doc. 29 at ¶ 25).  Medicare beneficiaries who had previously received hospice benefits were not prized because they had a reduced cap.  42 C.F.R. § 418.309.  Getting sufficient "undupes" was criticial because Medicare payments received by a hospice in excess of the aggregate cap have to be returned.  42 C.F.R. § 418.308(d).  Thus, for example, Frederick allegedly told Angels' marketers they had five weeks to get 60 new "undupes" prior to the cut-off date for determining Angels' aggregate cap to avoid repayment.  (Doc. 29 at ¶ 26).

Frederick allegedly told Willis that non-Medicare patients, including those who were indigent or had private insurance, were not to be admitted to Angels and any Medicare patients who had previously elected hospice care, and thus represented a fractional cap "cushion," had to be approved by Frederick personally.[4]  (Doc. 29 at ¶ 27).  Willis contends that Frederick admitted Medicare patients regardless of eligibility

---

[3] Willis allegedly recorded his conversations with Frederick and other Angels' personnel on multiple occasions.  Thus, Willis uses direct quotes throughout his complaint.

[4] Willis asserts Frederick was unlikely to approve "fractional" patients.  Frederick allegedly told Willis about one specific patient Frederick discovered was "fractional" only after admission and for whom Angels could recover only 18% of the per-beneficiary cap amount.  In response to this discovery, Frederick told Willis, "That wasn't enough to even admit the patient.  We should never have admitted that patient.  That patient only increased our length of stay.  Why admit that patient?"  (Doc. 29 at ¶ 27).

as long as they had not previously elected hospice care.  (Doc. 29 at ¶ 30).

Willis alleges Angels used "extremely aggressive marketing tactics" to find "undupes" for admission, and Angels only counted "undupes" toward the marketers' goals and bonuses.  (Doc. 29 at ¶ 27).  Rosie Fieseler, Angels' community relations manager, allegedly told Willis that Frederick admitted "anyone and everyone" he could find.  (Doc. 29 at ¶ 29).  Willis also claims Fieseler informed him that Frederick and one of Angels' salespeople, Tommy Mike, solicited patients by driving around neighborhoods looking for elderly, disabled people.  (Doc. 29 at ¶ 29).

Willis contends Frederick informed Angels' medical staff that their role was to process admissions and not assess patient eligibility or care needs.  (Doc. 29 at ¶ 30).  When Medicare patients did not qualify for the hospice benefit, Angels' nurses were allegedly told to admit the patients anyway and monitor their progress for 90 days.  (Doc. 29 at ¶ 30).  On one occasion, Angels' RN Michelle Demaro assessed a patient and determined the patient was not eligible for hospice because he was still receiving aggressive treatment.  Willis alleges Frederick admonished Demaro for turning away the patient, and Frederick then complained to Willis about the situation, stating: "You don't want to piss me off.  I mean, I wanted the patient admitted.  I just wanted the number in the house.  I mean, I want the head in the bed, I just wanted it done."  (Doc. 29 at ¶ 31).  Demaro recounted another occasion when Frederick ordered her to admit a patient and reminded her, "You know this is one that we just watch for 90 days."  (Doc. 29 at ¶ 32).  Willis alleges the true nature of the 90-day "observation period" was to receive the associated aggregate cap "cushion," and Angels discharged unqualified patients shortly after admission to avoid detection and erosion of the cap benefit.  (Doc.

29 at ¶ 32).

While Medicare patients who seek hospice treatment are required to be certified as terminally ill by medical professionals, Willis contends Frederick maneuvered around that requirement.  In response to a new "face to face" rule requiring prospective patients to be assessed in person by a physician or nurse practitioner, Frederick hired a nurse practitioner in August 2010 whom he was believed was "trainable," and Frederick allegedly told Willis, "She'll do what I ask her to do.  You know a lot of them won't." (Doc. 29 at ¶ 36).

Dr. David Fieseler, the medical director of Angels and husband to Rosie Fieseler, referred a high volume of his Medicare patients to Angels,[5] and Willis alleges Dr. Fieseler would certify and recertify patients as terminally ill at the request of his wife or Frederick without regard to the patients' actual conditions.  (Doc. 29 at ¶ 37).  Angels' clinical director, Vicki Richardson, and administrator, Wanda Allen, allegedly told Willis and Demaro to admit any patient of Dr. Fieseler's regardless of eligibility because Frederick "would make sure they got admitted anyway and Dr. Fieseler would document whatever [Frederick] needed to get them admitted."  (Doc. 29 at ¶ 37).  Frederick purportedly threatened staff who did not comply with his demands with termination, and Willis claims that, as a result, clinical personnel frequently manipulated records to create an appearance that patients were terminally ill when they were not.  (Doc. 29 at ¶ 38).

Willis provides a representative sample of five patients he contends were improperly admitted to Angels and falsely billed to Medicare.  Patient 1 was admitted on August 3, 2012 with a diagnosis of general debility.  (Doc. 29 at ¶ 40a).  Prior to

---

[5] Willis alleges that at the time he filed his complaint 80 patients from the Thomaston, Georgia area were enrolled at Angels, and 54 of those enrolled were patients of Dr. Fieseler.  (Doc. 29 at ¶ 39).

admission, Demaro assessed Patient 1 and informed Frederick that Patient 1 was not eligible because he was independent and able to perform activities of daily living. (Doc. 29 at ¶ 40a). Frederick allegedly told Demaro to admit Patient 1 anyway and to fabricate information in Patient 1's chart to indicate he could not perform activities of daily living. (Doc. 29 at ¶ 40a).

Demaro also assessed Patient 2, referred by Rosie Fieseler, in September 2010. (Doc. 29 at ¶ 40b). Rosie Fieseler suggested Patient 2 would be appropriate for hospice with a diagnosis of chronic obstructive pulmonary disease, while Frederick told Demaro to admit Patient 2 with a diagnosis of general debility. (Doc. 29 at ¶ 40b). Demaro did not believe Patient 2 was eligible for hospice care under either diagnosis because she could perform activities of daily living with minimal assistance, was not bedbound, and was not on oxygen. (Doc. 29 at ¶ 40b). Despite her concerns, Demaro admitted Patient 2 and allegedly told Willis, "I just did what I was told. They told me to admit her and I told them my concerns. But they told me to admit her, so I did what I was told." (Doc. 29 at ¶ 40b). Frederick ultimately ordered that Patient 2 be admitted on a "trial basis" but stated Patient 2 would be discharged in six months if she failed to decline. (Doc. 29 at ¶ 40b).

Patient 3 was admitted on November 15, 2010 with a diagnosis of heart disease. (Doc. 29 at ¶ 40c). Demaro believed Patient 3 was not eligible based on his symptoms and because he was not taking a diuretic. (Doc. 29 at ¶ 40c). Frederick allegedly ordered Demaro to alter Patient 3's admission assessment and falsely document that Patient 3 could not tolerate a diuretic. (Doc. 29 at ¶ 40c).

Patient 4, whose primary physician was Dr. Fiesler, was admitted on October 22, 2010 with a diagnosis of congestive heart failure. (Doc. 29 at ¶ 40d). Demaro informed Frederick that Patient 4 denied experiencing shortness of breath or chest pain during her assessment and was therefore ineligible for hospice care. (Doc. 29 at ¶ 40d). Frederick allegedly ordered Demaro to admit Patient 4 anyway and fabricate an entry on his chart indicating shortness of breath. (Doc. 29 at ¶ 40d).

Patient 5, whose primary physician was Dr. Fiesler, was admitted on September 2, 2010 with a diagnosis of coronary artery disease. (Doc. 29 at ¶ 40e). Demaro did not believe Patient 5 was eligible for hospice care because he had no chest pain and was able to perform activities of daily living independently and without discomfort. (Doc. 29 at ¶ 40e). Allen allegedly ordered Demaro to admit Patient 5 anyway and informed Demaro any patient of Dr. Fieseler would be admitted at Frederick's direction and monitored for at least 90 days. (Doc. 29 at ¶ 40e).

Willis contends Angels further perpetrated and concealed its fraud through several methods. First, Angels allegedly manipulated levels of patient care by withholding hospice aide visits during the patient's initial enrollment so that it could increase the frequency of visits later on to create the appearance of decline in the patient's condition. (Doc. 29 at ¶ 33). In a discussion about this issue with Willis, Frederick allegedly stated, "Questionable patients get three hospice aide visits a week at the time of admissions. The reason we do that is to help show decline. If we start out with five[,] we can't show decline." (Doc. 29 at ¶ 33).

Second, Willis contends Angels fraudulently shifted costs to Medicare through a pattern of revoking legitimate hospice patients who required palliative hospital care and

then backdating their paperwork to evade paying for those procedures.  (Doc. 29 at ¶ 46).  Hospices are required to pay for palliative care that exceeds the standard per diem rate paid by Medicare, and Angels allegedly rejected all cases where palliative costs related to hospitalization could be predicted.  (Doc. 29 at ¶ 47).  Willis alleges Angels coerced almost every hospitalized patient into signing a revocation of his hospice election, usually by telling the patient he would be "stuck with the bill" if he did not revoke the election.  (Doc. 29 at ¶ 48).  If a patient was hospitalized and received expensive procedures before Angels received notice and could revoke the patient, Willis alleges Angels simply backdated the revocation form so that it appeared the patient revoked his hospice election prior to his hospital stay and so that Medicare Part A or Medicaid became responsible for those costs.  (Doc. 29 at ¶ 49).  Willis alleges a specific example of backdating.  Patient 6 was admitted on November 1, 2010 with a diagnosis of congestive heart failure.  (Doc. 29 at ¶ 50).  Unknown to Angels, Patient 6 received an echocardiogram on November 2.  (Doc. 29 at ¶ 50).  Angels' nurse Elaine Daniel allegedly presented Patient 6 with a backdated revocation form and told Patient 6 she would be billed for the test if she did not sign the form.  (Doc. 29 at ¶ 50).  As a result, Willis contends the Government paid for the test which should have been paid for by Angels.

Willis further alleges Angels violated the Anti-Kickback Statute ("AKS") by paying remuneration to Dr. Fieseler in exchange for referrals.  Willis asserts Rosie Fieseler received a $2,000 bonus for every ten new Medicare patients she found for Angels, and she received at least $10,000 in bonuses for the last quarter of 2010.  (Doc. 29 at ¶ 43).  Willis claims Rosie Fieseler often discussed her current admission tally and her plans to

reach her maximum bonus level with him.  (Doc. 29 at ¶ 43).  Dr. Fiesler, who is Angels'

medical director and the primary physician for many of Angels' patients, received a

salary from Angels as well as bonuses for referrals indirectly through his wife, and Willis

contends these incentives prevented Dr. Fieseler from exercising independent medical

judgment.  (Doc. 29 at ¶ 44).

In Count I, Willis asserts all of these fraudulent practices and schemes led to the

submission of false claims for Medicare patients ineligible for hospice care.  (Doc. 29 at

¶¶ 53, 58).  In Count II, based on the same fraudulent conduct, Willis alleges Angels

knowingly used false records and statements to get Medicare to pay false claims.  (Doc.

29 at ¶ 53).  In Count III, Willis asserts Angels failed to refund Medicare overpayments

and knowingly concealed those funds.  (Doc. 29 at ¶ 63).

## II.  MOTION TO DISMISS STANDARD OF REVIEW

To avoid dismissal pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain

specific factual matter to "'state a claim to relief that is plausible on its face.'"  *Ashcroft v.

Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  "At the motion to dismiss stage, all well-pleaded facts are accepted as true,

and the reasonable inferences therefrom are construed in the light most favorable to the

plaintiff."  *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006) (internal

quotation marks and citation omitted).  However, "where the well-pleaded facts do not

permit the court to infer more than the mere possibility of misconduct, the complaint has

alleged—but it has not 'shown'—that the pleader is entitled to relief."  *Iqbal*, 556 U.S. at

679.  "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions

masquerading as facts will not prevent dismissal."  *Oxford Asset Mgmt., Ltd. v. Jaharis*,

297 F.3d 1182, 1188 (11th Cir. 2002).  Where there are dispositive issues of law, a court may dismiss a claim regardless of the alleged facts.  *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993) (citation omitted).

Claims of fraud brought pursuant to the FCA must also comply with the particularized pleading requirements of Fed. R. Civ. P. 9(b).  *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1308-09 (11th Cir. 2002).  Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Pursuant to the FCA, "a plaintiff must plead 'facts as to time, place, and substance of the defendant's alleged fraud,' specifically 'the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'"  *Id.* (quoting *U.S. ex rel. Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 567-68 (11th Cir. 1994)).

## III. DISCUSSION

Angels' briefs in support of its motion to dismiss take an interesting approach.  In its initial brief, Angels primarily attacks the credibility of Willis's factual allegations regarding Angels' alleged fraudulent schemes.  Its reply brief focuses on the issue that almost always determines the outcome of motions to dismiss false presentment claims – whether a relator has sufficiently alleged that false claims were actually submitted to the Government.  The Court addresses that issue first, and then addresses Angels' challenge to the factual sufficiency of Willis's allegations of the fraudulent schemes employed by Angels.  Finally, the Court addresses whether Willis has sufficiently alleged his reverse false claim.

### A.    Whether *Clausen* Requires the Dismissal of Willis's False Presentment Claims

The FCA subjects to civil liability "any person who … knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  In the healthcare context, "[t]he [FCA] does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe."  *Clausen*, 290 F.3d at 1311 (citation omitted).

It seems just about every FCA complaint draws a Rule 9(b) motion to dismiss based on *Clausen.*  If a relator cannot allege, based on personal knowledge, that false claims were actually presented to the Government, those motions are usually successful.  Here, Willis cannot allege that Angels' billing office submitted a bill to Medicare.  Nevertheless, based on the particular circumstances of this case, the Court concludes that *Clausen* does not require dismissal of Willis's false presentment claim.

In *Clausen*, the relator claimed that the defendant, a laboratory providing services to nursing homes, employed six different fraudulent schemes to submit false claims to the Government.  Essentially, the relator claimed that the testing was not medically necessary and/or was not done by physician order.  Although the relator never worked for the defendant – in fact he was a competitor – he alleged in considerable detail the ways in which the defendant defrauded the Government.  As detailed as those allegations were, the relator made only conclusory allegations with regard to actual billings of false claims, and he identified no claims that were actually submitted to the Government.  The district court, relying on Rule 9(b), dismissed the relator's complaint and amended complaint because they did not identify a specific

-11-

fraudulent claim.

On appeal, the Eleventh Circuit first noted the purposes of Rule 9(b)'s heightened pleading requirement: "'The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior.'"  *Id.* at 1310 (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)).  In false claims cases, the court continued, a "central question" is whether a false claim was presented.  *Id.* at 1311.  If a claim has not been presented, then notwithstanding the egregious nature of the intended scheme, there is no viable FCA claim.  Thus, a relator cannot allege merely that a false claim was submitted.  Rather, Rule 9(b) requires that the relator provide some indicia of reliability to support his allegation that a claim was actually submitted.  In *Clausen*, as detailed as the relator's allegations were, he never quite got to the point of alleging in any detail that a false claim had been submitted.  This, the Eleventh Circuit held, was "fatal to his complaints *under the particular circumstances of this case*."  *Id.* at 1312 (emphasis added).

Among those particular circumstances was the fact that the relator was an outsider without access to billing information that would allow him to plead that a false claim had been submitted.  Although the Eleventh Circuit had some sympathy for the relator's predicament, that lack of access did not relieve him of his Rule 9(b) burden.

Judge Barkett dissented, arguing that Clausen's detailed complaint adequately addressed the concerns raised by Rule 9(b).  First, the complaint alerted the defendants to the precise details of their alleged misconduct.  Second, Clausen's particularized

allegations served Rule 9(b)'s goal of protecting defendants from spurious fraud claims. To Judge Barkett, the majority put Clausen to the task of proving his claims – a burden not found in Rule 9(b).

*Clausen* has been read to hold that the minimum indicia of reliability required to satisfy Rule 9 are the specific contents of actual claims.[6] But not always. First, in an unreported decision, the Eleventh Circuit suggested that a more relaxed pleading standard may be appropriate when the relator "witnessed firsthand the alleged fraudulent submissions" so that his "factual allegations provide the indicia of reliability that is necessary in a complaint alleging a fraudulent billing scheme." *Hill v. Morehouse Med. Assoc.*, 2003 WL 22019936, at *5 (11th Cir.). Then in *U.S. ex rel. Walker v. R&F Properties of Lake County, Inc.*, the Eleventh Circuit accepted less billing detail because the relator's particularized allegations of the fraudulent scheme provided sufficient indicia of reliability that bills were presented. 433 F.3d 1349 (2005). Arguably, the Eleventh Circuit tacked back to *Clausen* in *U.S. ex rel. Sanchez v. Lymphatx, Inc.*, when it noted a possible inconsistency between *Clausen* and *Walker* and, if there were, said "to the extent that *Walker* conflicts with specificity requirements of *Clausen*, our prior-panel-precedent rule requires us to follow *Clausen*." 596 F.3d 1300, 1303 n.4 (11th Cir.

---

[6] *See, e.g.*, *U.S. ex rel. Wilson v. Crestwood Healthcare, L.P.*, 2012 WL 1886351, at *7 (N.D. Ala.) ("As with the relator[] in *Clausen, …* relator has provided a detailed explanation of the illegal scheme that, he alleges, precipitated false claims. But, as with the relator[] in the *Clausen …* case[], he provides no details regarding the submission of any claims."); *Cade v. Progressive Cmty. Healthcare, Inc.*, 2011 WL 2837648, at *8 (N.D. Ga.) ("Although [the relator] relies on her 'observations' as an assistant office manager, her allegations that Defendants actually submitted false claims are general and conclusory. … When it comes to the actual submission of claims, … the person or persons actually submitting the claim remain a mystery. She cites 'discussions with other individuals involved in the billing process,' … but … she does not identify with whom she spoke or otherwise provide details that would support the allegations.").

2010) (citation omitted).

But more recently the Eleventh Circuit followed *Walker* in *U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, when it expressed tolerance "toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct." 671 F.3d 1217, 1230 (11th Cir. 2012) (citing *Walker*, 433 F.3d at 1360). Thus, the relator's "detailed allegations of the accounting records, his position at the company, and his involvement with the patient accounts" were sufficient to support his claim that a false record was created notwithstanding the fact that the relator did not have personal involvement in the actual submission of the false record. *Id.* (citing *Walker*, 433 F.3d at 1360).[7]

It is not entirely clear from these cases whether establishing the "indicia of reliability" is an additional standard a relator may use in lieu of pleading the details of the submission of false claims or if, as *Sanchez* seems to suggest, it is a requirement in addition to pleading actual submission of at least a few false claims. District courts in this Circuit appear to consider whether a complaint presents indicia of reliability separately from the sufficiency of the allegations of fraudulent billing. *See, e.g.*, *U.S. ex rel. Mastej v. Health Mgmt. Assocs.*, 869 F. Supp. 2d 1336, 1345 (M.D. Fla. 2012) (emphasis added) ("Rule 9 *can also be satisfied* if a [c]omplaint has [] 'indicia of reliability' that indicates that false claims were in fact submitted to the government.").

In any event, this Court does not read *Clausen* or its progeny to hold a relator must in every case allege detailed billing information to withstand a Rule 9(b) motion.

---

[7] The Fifth Circuit has concluded that the Eleventh Circuit "has moved away from *Clausen's* most exacting language, accepting less billing detail in a case where particular allegations of a scheme offered indicia of reliability that bills were presented." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009).

Angels' interpretation of *Clausen* would almost necessarily require the relator to have access to the billing department or otherwise have the ability to purloin copies of fraudulent bills.  But *Clausen* makes clear that the determination of whether a relator has sufficiently alleged the presentment of actual false claims to the Government is decided on a case-by-case basis.  *See Clausen*, 290 F.3d at 1312 (emphasis added) ("[The relator's] failure to allege with any specificity if—or when—any actual improper claims were submitted to the Government is indeed fatal to his complaints *under the particular circumstances of this case*.").

In the particular circumstances of this case, the Court is satisfied that the requirements of Rule 9(b) are met.  Willis's allegations in large part are based upon the recorded conversations of Angels' management.  If Willis is believed, Angels' management has largely admitted that it fraudulently billed the Government.  No goal of Rule 9(b) would be served by requiring Willis to have recorded a clerk in Angels' billing department confirming that a bill was actually submitted.  If Angels did what its management said it was doing, it necessarily follows that fraudulent bills were submitted to the Government.  At this stage of the case, there is no reason to require Willis to produce an exemplar bill to prove his allegations.  Of course, he will have to prove his allegations, but for now, he has alleged sufficiently detailed information of Angels' fraudulent conduct to withstand a motion to dismiss.

### B.   Whether Willis Has Sufficiently Alleged the Underlying Fraudulent Schemes

Angel argues that Willis has failed to allege with particularity the fraudulent schemes on which he bases Counts I and II of his amended complaint.  Willis premises these counts on four schemes: (1) the admission of patients ineligible for hospice care;

(2) fraudulent revocations of hospice elections; (3) violations of the AKS through illicit referrals; and (4) false certifications of compliance with Medicare regulations.[8]

First, Angels contends Willis has not alleged sufficient facts to show the five patients he has identified, or any other patients, were ineligible for hospice care because Willis fails to allege Angels lacked certifications of terminal illness required for those patients. Before a Medicare patient may receive hospice care, a patient's attending physician and the hospice's medical director are required to each certify in writing at the beginning of the first 90-day period "that the individual is terminally ill … based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness." 42 U.S.C. § 1395f(a)(7)(A)(i). At the beginning of a subsequent 90 or 60-day period, the medical director or physician must recertify "that the individual is terminally ill based on such clinical judgment." 42 U.S.C. § 1395f(a)(7)(A)(ii). Rather than alleging Angels lacked these certifications, it argues, Willis merely alleges that Demaro had clinical disagreements regarding the eligibility of some patients, and Willis has not asserted a factual basis for Demaro's belief that the certifying physicians were wrong. Angels further argues that Willis's allegations are insufficient in this regard because he alleges only that Demaro was instructed to falsely chart the five patients' medical conditions but not that she actually followed those instructions.

Angels' arguments are unavailing. Willis is not merely alleging Demaro disagreed with the medical opinions of treating physicians. Rather, Demaro informed

---

[8] Regarding the use of fraudulent certifications of compliance, Angels argues that Willis has not alleged Angels knew the certifications were false. Willis, however, has alleged throughout his complaint that Angels knowingly disregarded Medicare regulations. If Angels knowingly violated Medicare regulations, then it knew its certifications of compliance with those regulations were false.

Willis that these patients did not exhibit or experience the necessary symptoms to be certified as terminally ill based on her in-person assessments.[9]  She then reported her findings to members of Angels' management who told her to fabricate the presentation of those symptoms in the patients' charts so that they could be admitted.  Also, Willis does allege that Demaro followed the instructions to falsely chart the patients' conditions when Willis directly quotes her statement to him, "I just did what I was told." (Doc. 29 at ¶ 40b).  Further, Willis has alleged that Dr. Fieseler received illicit kickbacks for his patient referrals through his wife's bonuses.  Willis asserts the allegations that Dr. Fieseler received kickbacks and that he acted as the primary physician for a significant percentage of Angels' patients sufficiently show that Dr. Fieseler operated under a conflict of interest and failed to exercise appropriate clinical judgment when he falsely issued certifications of terminal illness.

Second, Angels argues that Willis has failed to identify a single patient who was coerced into signing a revocation and that Willis fails to understand a Medicare patient who has elected hospice care may revoke that election at any time.  A Medicare patient "may revoke [his] election of hospice care at any time during an election period" provided he files a signed statement with the hospice that includes "[t]he date that the revocation is to be effective."  42 C.F.R. § 418.28.  However, "[a]n individual or representative may not designate an effective date earlier than the date that the revocation is made."  42 C.F.R. § 418.28(b)(2).

Angels attempts to argue the regulation does not preclude revocation from being "made" by actions consistent with revocation, such as by receiving treatment

---

[9] For example, Demaro disagreed with Patient 4's diagnosis of congestive heart failure because Patient 4 denied experiencing shortness of breath or chest pain during her assessment.

inconsistent with the hospice benefit, and later signing a statement backdating the time of revocation to when the inconsistent actions were taken.  Angels does not cite any authority nor argue legislative intent supports its reading of the regulation.

Angels further argues "there is nothing inherently sinister or improper" about telling a hospice patient he will be "stuck with the bill" if he elects to pursue treatment not covered by the hospice benefit.  (Doc. 33-1 at 9).  Angels misunderstands  Willis's allegations.  Willis never alleges Angels was simply informing its patients they would have to pay for expenses not covered under the hospice benefit nor does he allege facts "merely consistent with" illegal conduct.  *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Rather, Willis alleges that Angels coerces all of its patients who are hospitalized into revoking their hospice election to avoid the possibility of having to pay for its patients' expenses that exceed the per diem rate for hospice reimbursement.  (Doc. 29 at ¶ 48).  Short-term inpatient care for treatment, including symptom management, pain control, and respite, is covered under the hospice benefit.  *See* 42 C.F.R. §§ 418.108, 418.202.  Willis contends the hospitalizations at issue were covered under the hospice benefit, and Angels should have paid for these services with its Medicare reimbursements.

Although Angels states that Willis has failed to identify a single patient coerced into signing a revocation, it does acknowledge Willis's allegations regarding Patient 6 and her echocardiogram.  However, Angels contends echocardiograms are not covered under the hospice benefit, pointing only to 42 C.F.R. § 418.200.  This regulation states, "To be covered, hospice services must meet the following requirements.  They must be reasonable and necessary for the palliation and management of the terminal illness as

well as related conditions." 42 C.F.R. § 418.200. Nothing in this regulation or other applicable regulations indicates echocardiograms are always considered non-palliative care. *See also* 42 C.F.R. §§ 410.20, 418.202.

Third, Angels argues that Willis has not sufficiently pled the existence of a compensation arrangement that violates the AKS. Angels contends that Willis has not pled violations of the AKS with particularity because he does not sufficiently allege that Dr. Fieseler received remuneration in exchange for referrals or explain how Rosie Fieseler's employment with Angels resulted in illicit referrals. The AKS criminalizes the knowing or willful offer or payment of:

> any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person … to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b)(2)(A). A violation of the AKS may form the basis for a claim pursuant to the FCA. *See McNutt ex rel. U.S. v. Hayleville Med. Supplies, Inc.*, 423 F.3d 1256, 1259-60 (11th Cir. 2005).

Willis contends Dr. Fieseler received indirect remuneration for referrals of his Medicare patients through his wife's bonuses, which were based on the volume of patients referred. Willis alleges Rosie Fieseler's employment at Angels helped secure illicit referrals because she would ask her husband to certify and recertify patients as terminally ill without regard to their actual conditions. (Doc. 29 at ¶ 37). Willis also alleges Dr. Fieseler directs his patients to his wife for admission, and Rosie Fieseler received a $2,000 bonus for every ten new Medicare patients she admitted. (Doc. 29 at ¶ 43). Further, patients referred by Dr. Fieseler did not receive an independent

evaluation of whether they were eligible for hospice because they were also certified as terminally ill by Dr. Fieseler in his position as Angels' medical director.

Willis has sufficiently alleged Angels knowingly paid remuneration to Dr. Fieseler, although indirectly through his wife's bonuses, to induce him to refer Medicare patients to Angels for hospice care. Angels argues that because the AKS does not explicitly prohibit employing the family member of a referring physician Willis must allege facts showing Rosie Fieseler did not have a legitimate employment relationship with Angels. Angels seems to argue that to sufficiently allege a violation of the AKS Willis must allege with particularity that Rosie Fieseler does not fall within the bona fide employee exception of the Statute. This exception states that the prohibitions against providing compensation in exchange for referrals "shall not apply to … any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a-7b(b)(3)(B).

Even if Rosie Fieseler is a bona fide employee, it is not clear as a matter of law that the exception covers bonuses paid to her if they were intended to indirectly induce Dr. Fieseler to refer his patients to Angels. Further, the employment exception to the AKS is an affirmative defense on which Angels has the burden of proof. *U.S. ex rel. Parikh v. Citizens Med. Ctr.*, 2013 WL 5304057, at *10 (S.D. Tex.); *accord United States v. Vernon*, 723 F.3d 1234, 1270-71 (11th Cir. 2013) (stating the employment exception to the AKS is an affirmative defense); *U.S. ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, 2012 WL 921147, at *5 (M.D. Fla.) (stating the financial relationship exceptions to the Stark Amendment appear to be affirmative defenses, and "nothing in [the

Amendment's] language requires that the applicability of such exceptions be denied in the initial pleadings").[10]  Thus, Willis is not required to plead that any of the AKS's safe harbors are inapplicable to Angels' alleged referral scheme.

Count II of the amended complaint is based on violations of Section 3729(a)(1)(B) of the FCA, which subjects to civil liability "any person who … knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).[11]  Unlike Section 3729(a)(1)(A), Section 3729(a)(1)(B) does not contain a presentment clause and "does not demand proof that the defendant presented or caused to be presented a false claim to the government or that the defendant's false record or statement itself was ever submitted to the government."  *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1327 (11th Cir. 2009).  Under the pre-FERA version of this Section, the Eleventh Circuit held that a plaintiff must show: "(1) the defendant made a false record or statement for the purpose of getting a false claim paid or approved by the government; and (2) the defendant's

---

[10] The Stark Amendment prohibits certain referrals when "a physician (or an immediate family member of such physician) has a financial relationship with an entity … then – (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A)."  42 U.S.C. § 1395nn(a)(1).  Like the AKS, the Stark Amendment provides an exception for bona fide employment relationships.  *Id.* § 1395nn(e)(2).

[11] On May 20, 2009, the FCA was amended by the Fraud Enforcement and Recovery Act ("FERA").  Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621 (2009).  Pre-FERA, this Section imposed liability on any person who "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. § 3729(a)(2) (2003).  The amendment deleted the "to get" and "paid or approved by the government" requirements and added the materiality requirement.  However, the addition of the materiality requirement does not appear to have any impact on this Section because the Supreme Court held under the pre-FERA version that "a plaintiff asserting a § 3729(a)(2) claim must prove that the defendant intended that the false record or statement be material to the Government's decision to pay or approve the false claim."  *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 665 (2008).

false record or statement caused the government to actually pay a false claim, either to the defendant itself, or to a third party." *Id*.  Because the plaintiff had to prove the Government in fact paid a false claim, the complaint had to allege with particularity that the defendant's "false statements ultimately led the government to pay amounts it did not owe." *Id*. at 1329.  The court, however, declined to consider whether actual payment of a false claim is an element of this Section of the FCA as amended by the FERA.  *Id*. at 1329 n.4.  District courts in this Circuit have continued to use the elements set forth in *Hopper* to determine whether plaintiffs have sufficiently alleged claims pursuant to the post-FERA version of this Section.  *See, e.g.*, *U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 2013 WL 5340480, at *15-16 (N.D. Ga.); *Mastej*, 869 F. Supp. 2d at 1345.

The purposes of the alleged schemes discussed above are directly linked to Medicare's decisions to pay the resulting false claims.  Accordingly, Willis has sufficiently pled false records and statements were made for the purpose of getting false claims approved.  Further, for the reasons discussed above, Willis's allegations have the indicia of reliability to excuse any failure to allege with particularity the details of Medicare payments received by Angels, and he has sufficiently pled a claim pursuant to this Section of the FCA.

### C.   Whether Willis Has Sufficiently Alleged the Existence of Reverse False Claims

The FCA further imposes liability on "any person who … knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or

property to the Government." 31 U.S.C. § 3729(a)(1)(G). "This is known as the 'reverse false claim' provision of the FCA because liability results from avoiding the payment of money due to the government, as opposed to submitting to the government a false claim." *Matheny*, 671 F.3d at 1222 (citation omitted). "To establish a reverse false claim, a relator must prove: (1) a false record or statement; (2) the defendant's knowledge of the falsity; (3) that the defendant made, used, or causes to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government; and (5) the materiality of the misrepresentation." *Id.* (citations omitted). "[P]resentment of a false claim is not at issue and presentment of a false statement is not required by the statute and thus, does not need to be pled." *Id.* at 1224 n.12 (citations omitted).

Willis alleges Angels violated this Section of the FCA by failing to repay Medicare the hospice per diem payments received for ineligible patients and the cost of palliative hospital inpatient treatment that should have been paid for by Angels. Quoting *Mastej*, Angels argues that Willis has made "no specific allegations to support [this] claim," and his complaint "fails to allege any amounts owed to the government by [Angels] or otherwise provide any other information that puts [Angels] on notice as to the substance of [Willis's] claims." (Doc. 33-1 at 14-15) (quoting 869 F. Supp. 2d at 1346-47). Angels further contends that Willis's "allegations related to this claim are general and conclusory and fail to meet the pleading requirements in Rule 9." (Doc. 33-1 at 15) (quoting *Id.* at 1347).

As discussed above, Willis has sufficiently pled the first three elements of a reverse false claim, i.e., the existence of false records and statements, Angels'

knowledge of the falsity, and that those records and statements were used.  Willis must also show that Angels owed an obligation to pay money to the Government at the time of the allegedly false statements.  *Id.* at 1223 (citation omitted).  "[T]he term 'obligation' means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).  The regulations governing the Medicare hospice benefit require hospices to refund Medicare any excess reimbursement for inpatient care or reimbursements that exceed the aggregate cap amount.  42 C.F.R. §§ 418.302, 418.308.

Willis contends Angels acted to conceal, avoid, or decrease its obligation to repay Medicare.  Willis argues the motivation behind admitting only Medicare patients who have not previously elected hospice care is those patients allow Angels to avoid having to refund overpayments to Medicare at the end of the cap year because they represent the full aggregate cap "cushion."  For example, in August 2010, Frederick allegedly told Willis, "We have five weeks to make 60 Medicare 'undupes' prior to September 25.  For every patient we don't get, we're going to have to pay Medicare back $25,000."  (Doc. 29 at ¶ 26).  Willis also alleges Frederick contrived a 90-day observation period for ineligible patients so Angels would benefit from the cap "cushion," and Angels would discharge those patients shortly after the observation period ended to evade detection.  (Doc. 29 at ¶ 32).  Further, the alleged false revocation scheme discussed above is another way that Angels avoided or decreased its obligation to repay Medicare by shifting the cost of inpatient treatment onto the Government.  Willis

alleges, as a result of this scheme, the Government had to pay a full fee-per-service rate for the same care it had already reimbursed Angels for at the lower hospice per diem rate.  (Doc. 29 at ¶ 49).

Contrary to Angels' argument, Willis does make specific allegations in support of his claim and has sufficiently put Angels on notice of the underlying schemes or actions that form the basis of the alleged reverse false claims.  Willis alleges who knew of the overpayments, how Angels violated its obligation to refund Medicare, when those violations occurred, and what Angels gained as a result.  *See Matheny*, 671 F.3d at 1226-27.  Finally, Willis has sufficiently alleged the misrepresentations were material because they were of a nature to influence Medicare's decision making.  *See id.* at 1228-29 (citations omitted) ("When the government relies on the defendant to identify and report the value of government property in the defendant's possession, and the defendant misrepresents the value of that property, the misrepresentation is material.").  Accordingly, Willis has sufficiently pled that Angels violated 31 U.S.C. § 3729(a)(1)(G).

## IV.  CONCLUSION

For the foregoing reasons, Angels' motion to dismiss is **DENIED**.

**SO ORDERED,** this 20th day of February, 2014.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT